**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────────

FREDERICK PAUL PETELL, JR.,

                           Plaintiff,

   v.                              No. 12-CV-1596
                                      (LEK/CFH)

COMMISSIONER OF SOCIAL SECURITY,

                           Defendant.

─────────────────────────────────

**APPEARANCES:**                      **OF COUNSEL:**

CONBOY, MCKAY LAW FIRM        LAWRENCE D. HASSELER, ESQ.
  - CARTHAGE OFFICE
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. RICHARD S. HARTUNIAN      VERNON NORWOOD, ESQ.
United States Attorney for the        Special Assistant United States Attorney
  Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff Frederick Paul Petell, Jr. ("Petell") brings this action pursuant to 42

U.S.C. § 405(g) and § 1383(c)(3) seeking review of a decision by the Commissioner of

Social Security ("Commissioner") denying his application for benefits under the Social

Security Act.  Compl. (Dkt. No. 1).  Petell moves for a finding of disability and the

─────────────────────

[1]  This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 12, 15. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born May 18, 1971, Petell was thirty-seven years old when he applied for disability benefits. Tr. at 128.[2] Petell attended special education classes but was expelled from ninth grade. Tr. at 39–40, 138. Petell can read and write English. Tr. at 132. Petell was previously employed as a herdsman, linesman, and a construction worker. Tr. at 40, 200. Petell alleges disability from dyslexia, migraines stemming from a brain injury, and mental health issues. Tr. at 133.

### B. Procedural History

Petell protectively filed an application for supplemental security income ("SSI") benefits on January 28, 2009 and social security disability insurance ("SSDI") benefits on February 1, 2009 pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of September 1, 2008. Tr. at 16, 128. That application was denied on June 5, 2009. Tr. at 16, 62–68. Petell requested a hearing before an administrative law judge ("ALJ"), Marie Greener, which was held on July 27, 2010. Tr. at 69–70, 34–60 (transcript of the administrative hearing). In a decision dated September 14, 2010, the ALJ found that Petell was not entitled to disability benefits.

---

[2] "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 8.

2

Tr. at 16–27.  Petell's counsel filed a timely request for review with the Appeals Council and on August 24, 2012, the request was denied, thus making the ALJ's findings the final decision of the Commissioner.  Tr. at 1–9.  This action followed.

## II.  Discussion

## A.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 U.S.C. § 405(g) (2006); Halloran, 362 F.3d at 31.

3

## B. Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability . . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006)[4] (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520,

    [3]  While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec'y of Health and Human Servs., 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

    [4]  All Social Security Rulings and unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he [or
> she] is not, the [Commissioner] next considers whether the
> claimant has a 'severe impairment' which significantly limits
> his [or her] physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence,
> the claimant has an impairment which is listed in Appendix 1
> of the regulations. If the claimant has such an impairment,
> the [Commissioner] will consider him [or her] disabled
> without considering vocational factors such as age,
> education, and work experience; the [Commissioner]
> presumes that a claimant who is afflicted with a 'listed'
> impairment is unable to perform substantial gainful activity.
> Assuming the claimant does not have a listed impairment,
> the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity
> to perform his [or her] past work. Finally, if the claimant is
> unable to perform his [or her] past work, the [Commissioner]
> then determines whether there is other work which the
> claimant could perform.

Berry, 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each

of the first four steps. DeChirico v. Callahan, 134 F.3d 1177, 1179–80 (2d Cir. 1998)

(citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden

shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful

employment somewhere. Id. at 1180 (citing Berry, 675 F.2d at 467).


### C. ALJ Greener's Findings

Petell, represented by counsel, testified at a hearing held on July 27, 2010. Tr. at

16–27. In addition, Petell's wife, Eva Petell, also testified. Id. Using the five-step

disability sequential evaluation, the ALJ found that Petell: (1) had not engaged in

substantial gainful activity since September 1, 2008, the alleged onset date; (2) had

severe medically determinable impairments of gastroesophageal reflux disease ("GERD")[5] and intermittent explosive disorder ("IED");[6] (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [("RFC")] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[7] except no more than occasional contact with supervisors, co-workers, or the public"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Tr. at 18–27. Therefore, a determination of not disabled was made.

### D. Petell's Contentions

Petell first contends that the ALJ failed to assess the severity of his migraine headaches and lower back pain. Petell next contends that the ALJ's RFC assessment

---

[5] "Gastroesophageal reflux" refers to the "reflux of the stomach and duodenal contents into the esophagus, which may sometimes occur normally . . . or as a chronic pathological condition." DORLAND'S ILLUSTRATED MED. DICTIONARY 1439 (28th ed. 1994) [hereinafter "DORLAND'S"].

[6] Intermittent explosive disorder is a behavioral disorder characterized by repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which the individual reacts grossly out of proportion to the situation. Intermittent Explosive Disorder: Definition, MAYO CLINIC, http://www.mayoclinic.com/health/intermittent-explosive-disorder/DS00730 (last visited Feb. 28, 2014).

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20. C.F.R § 416.967(b).

was erroneous because she improperly applied the treating physician's rule, failed to recontact a treating source, failed to afford weight to the opinions of Petell's social worker, and failed to support it with substantial evidence. Petell then asserts that the ALJ improperly evaluated Petell's credibility. Petell next contends that the ALJ failed to apply the psychiatric review technique ("PRT") required for evaluating mental impairments. Lastly, Petell claims that the ALJ failed to support the Step 5 conclusion with substantial evidence.

**1. Severity**

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. See subsection II(B) supra. Thus, a diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." Id. Basic work activities which are relevant for evaluating the severity of an impairment include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

7

Id.; see also Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y.1996); see also

Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3–4 (S.S.A. 1985).


### i. Migraine Headaches

Petell argues substantial evidence shows that his migraine headaches impose at

least more than a minimal limitation. Pl.'s Mem. of Law (Dkt. No. 12) at 12. Since a

syncopal episode[8] in November 2007, Petell asserts he has consistently sought

treatment for headaches. Id. Petell notes that in April 2009, he was referred to a

consultative examiner ("CE") and neurologist, Dr. Harbinder Toor ("Toor"), M.D., who

opined that Petell's "headaches can interfere with [Petell's] daily routine." Tr. at 289.

However, Dr. Toor does not specify how such migraine headaches significantly limit

Petell's ability to do basic work activities. 20 C.F.R. § 404.1521(b). Further, Dr. Toor's

opinion was not based on any medical exams but solely on Petell's statements, which

contradict other treatment notes of record. Tr. at 287, 289. Petell next notes that, in

August 2008, Petell advised his treating source Richard Edwards ("Edwards"), RPA-C,

a registered physician assistant, that he was having approximately two headaches each

week. Tr. at 264. Additionally, Petell points to treatment notes dated December 2011

where Edwards noted Petell's continued headaches despite modification to his

medication. Tr. at 443–44.

Despite the above record evidence indicating that Petell has had migraines since

November 2007, the ALJ's finding that Petell's migraines were non-severe are

---

[8] A "syncope" is "a faint or swoon." DORLAND'S at 1622.

supported by substantial evidence.  Tr. at 18.  The ALJ expanded on this conclusion at length.  The ALJ noted that objective medical evidence, namely CT scans, revealed Petell's syncopal episode was likely caused by migraines without aura.  Tr. at 212–13, 219, 222.  The ALJ considered contrary evidence, namely that Petell advised Neurologist Dr. Edward J. Mazdzer, M.D. ("Mazdzer") in October 2008 that he had no headaches since November 2007 but reported to Dr. Toor in April 2009 that he had daily headaches.  Tr. at 258, 287.  In December 2007, Edwards noted that Petell has a history of prior migraines but they had been dormant and placed Petell on Nadolol to treat the headaches.[9]  Tr. at 238.

The ALJ cited 2008 treatment notes indicating that Petell's headaches were stable and under control.  Tr. at 18–19.  In April 2008, Petell reported to Edwards that he had "no headaches whatsoever."  Tr. at 241.  On July 22, 2008, Petell reported to Edwards having no headaches since November 2007 and Petell was advised to avoid driving and climbing until seen by a neurologist.  Tr. at 239.  As Petell noted, the ALJ also considered that on August 20, 2008, Petell claimed he had approximately two headaches each week though that were "very mild," "not associated with weakness, dizziness, faintness, loss of consciousness, numbness, tingling, or any visual disturbances," and "usually respond[ed] to Tylenol."  Tr. at 243, 264.  Petell claimed a "little dizziness" when he stood up from a chair, although the dizziness was transient, mild, and dissipated after a few seconds.  Tr. at 243.  Edwards concluded that Petell's

---

[9] Nadolol is a beta-blocker that is used to treat chest pains, high blood pressure, and other conditions as determined by a physician.  Available at http://www.drugs.com/cdi/nadolol.html (last visited Feb. 27, 2014).

migraines were stable.  Tr. at 244.  The ALJ further noted that in October 2008, Dr. Mazdzer concluded that Petell "could safely operate a motor vehicle and return to work without restrictions."  Tr. at 258.

The ALJ next cited 2009 treatment notes also indicating that Petell's migraine headaches were controlled.  In February 2009, Petell reported to Edwards that he had no syncopal episodes, severe headaches, or other problems.  Tr. at 247.  In May 2009, Petell reported to Edwards that he was having several headaches per week and was prescribed Topamax.[10]  Tr. at 249–50.  In June 2009, Petell advised Edwards that the Topamax gave him some morning drowsiness but had no headaches.  Tr. at 251.  In July 2009, Petell reported fainting and vomiting while lifting weights.  Tr. at 253.  As a result, Petell's Nadolol dosage was decreased and was advised to refrain from exercising over the weekend only.  Tr. at 253.  Petell was also diagnosed with symptomatic bradycardia[11] that was likely induced in part by valsalva maneuver[12] and the Topamax dosage was increased.  Tr. at 253–54.  In August 2009, Petell continued to have syncopal symptoms and vomiting when lifting heavy weights during his workouts but had no headaches.  Tr. at 255.  These symptoms were absent when conducting other activities.  Id.  Thus, Petell was advised to find another exercise

---

[10]  "Topamax (topiramate) is a seizure medication . . . also used to prevent migraine headaches in adults.  It will only prevent migraine headaches or reduce the number of attacks.  It will not treat a headache that has already begun."  Available at http://www.drugs.com/topamax.html (last visited Feb. 28, 2014).

[11]  "Bradycardia" is the "slowness of the heartbeat."  DORLAND'S at 223.

[12]  "Valsalva maneuver" refers to "forcible exhalation effort against a closed glottis . . . interfer[ing] with venous return to the heart."  Id. at 985.

method, take Nadolol and Topamax, and avoid heavy lifting.  Id.

Lastly, the ALJ noted that recent treatment notes, ranging from December 5, 2007 through January 13, 2010, reveal that Petell's migraines were under control.  Tr. at 19, 238–55, 259–70, 293–95, 345–50, 373–80.  The ALJ concluded no record evidence shows that Petell's migraines imposed significant-related restrictions and no such evidence was provided from Petell's treating source.  Tr. at 19.  Additionally, in January 2012, Petell reported to Edwards that his headaches were "adequately controlled with current medications."  Tr. at 445.

Given the above relevant record evidence dated November 2007 through December 2011 where there were only two changes to Petell's medications, a reasonable mind could accept as adequate to support the ALJ's conclusion that Petell's migraine headaches were not sufficiently severe to significantly limit Petell's ability to engage in basic work activities.  Halloran, 362 F.3d at 31.  Further, the Second Circuit has found that an ALJ's error at step two is not reversible error if the ALJ found other severe impairments and proceeded beyond step two.  Stanton v. Astrue, 370 F. App'x 231, 233 n.1 (2d Cir. 2010).  Here, the ALJ found Petell had severe medically determinable impairments of GERD and IED.  Furthermore, the ALJ expressly considered the "combination of impairments" in making her determination of not disabled.  Stanton, 370 F. App'x at 233 n.1.  Moreover, the ALJ discussed Petell's headaches at length in her RFC assessment.  Tr. at 25.  Spina v. Colvin, No. 11-CV-1496, 2014 WL 502503, at *4 (N.D.N.Y. Feb. 7, 2014) ("[B]ecause the ALJ found that plaintiff had the severe impairment of neurocardiogenic syncope, he continued to consider plaintiff's disability under Steps Three through Five of the disability analysis.  Even if it had been error to

find plaintiff's migraines to be a nonsevere impairment, the error would have been harmless."). Thus, any error in finding Petell's migraine headaches to be non-severe would be merely harmless.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### ii. Lower Back Pain

Petell next contends that substantial evidence shows his lower back pain imposes at least more than a minimal limitation. Pl.'s Mem. of Law at 13. In December 2010, Petell was referred for physical therapy where his reduced lumbar flexion and extension were noted. Tr. at 420–21. In March 2011, Dr. John Savage, M.D., an orthopedic surgeon, noted that a compression examination caused pain and tenderness in the lower back and an x-ray showed wedging of T11, suggesting a compression fracture. Tr. at 437–38. In April 2011, Petell was diagnosed with a "fairly high-grade foraminal narrowing at L4-5 and L5-SI due to combination of disk bulging and facet hypertrophy." Tr. at 440. Readings of a MRI dated April 2012 showed "broad-based disk bulges at all lumber levels L1 through L5-S1," with "the most significant foraminal narrowing . . . at L4-L5." Tr. at 450. Petell was referred to a specialist Dr. Craig T. Montgomery, M.D. who noted that steroid injections, aggressive physical therapy, pain management, and nonsteroidal anti-inflammatories failed to control the condition. Tr. at 450.

Defendant did not address this issue with good reason. As the Appeals Council noted, the ALJ could not have addressed Petell's medical records relating to lower back pain because that condition, and any relevant medical records concerning the condition, was raised for the first time after the ALJ issued her decision on September

14, 2010.  <u>See</u> Tr. at 420 (noting that in December 2010, while at work, a bull struck

Petell's lower back, causing him lower back pain).  The Appeals Council is only

obligated to consider new and material evidence that relates to the period on or before

the date of the ALJ hearing decision.  <u>Shrack v. Astrue</u>, 608 F. Supp. 2d 297, 302 (D.

Conn. 2009) (citing <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996); 20 C.F.R. §

404.970(b)).  Thus, the Appeals Council correctly explained, "[w]e found that some of

the evidence was after the [ALJ's] decision. . . .  If you want us to consider whether you

were disabled after September 14, 2010, you need to apply again.  We are returning

the evidence to you to use in your new claim."  Tr. at 2.

Accordingly, the Commissioner's decision on this issue should be affirmed and any

arguments pertaining to Petell's purported lower back condition will not be further

addressed in this Report-Recommendation.


## 2.  RFC

The ALJ determined that Petell retained the RFC "to perform medium work . . .

except no more than occasional contact with supervisors, co-workers, or the public."

Tr. at 21.  Petell contends that the ALJ erred when she failed to:  (1) apply the treating

physician's rule to the opinions of psychiatrist Dr. M. U. Saleem, M.D. and recontact Dr.

Saleem for further development of the record; (2) afford proper weight to social worker

Bob Bower's opinions; and (3) support her RFC assessment with substantial evidence.

Defendant did not specifically address the first two issues in her motion papers.

### i. Treating Physician's Rule and Recontact

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  <u>Harris v. R.R. Ret. Bd.</u>, 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); <u>Shaw</u>, 221 F.3d at 134.  "This rule applies equally to retrospective opinions given by treating physicians."  <u>Campbell v. Astrue</u>, 596 F. Supp. 2d 445, 452 (D. Conn. 2009) (citations omitted).  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion:  "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  <u>Schaal</u>, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  <u>Snell v. Apfel</u>, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  <u>Id.</u> at 133–34; <u>see</u> 20 C.F.R. § 404.1527(e) (2005).

Petell contends that Dr. Saleem's opinions should have been given controlling weight. Dr. Saleem saw Petell in January 2009 and noted that Petell had IED and a history of anger management problems; however, Petell did not receive any mental health treatment for it since 1997. Tr. at 259. Petell was appropriately dressed with good hygiene, cooperative, coherent, and in a positive mood. Tr. at 250. Petell's memory was intact, attention and concentration were fair, insight and judgment were fair, and denied suicidal/homicidal ideations and hallucinations. Id. Dr. Saleem evaluated Petell with a Global Assessment of Functioning ("GAF") 65.[13] Tr. at 260.

In August 2009, Dr. Saleem and Bob Bowser ("Bowser"), a licensed social worker, provided a medical source statement ("MSS") for Petell based on sessions between January 14, 2009 and August 26, 2009. Tr. at 334. Dr. Saleem concluded that Petell's IED slightly affected Petell's ability to understand, remember, or carry out short and simple instructions. Id. Petell's ability to make judgments on simple work-related decisions was moderately affected. Id. Petell's ability to understand, remember, and carry out detailed instructions were severely impaired. Id. The MSS continued, noting

---

[13]

> GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Zabala v. Astrue, 595 F.3d 402, 405 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. rev. 2000)).

that Petell's ability to interact appropriately with the public, supervisors, and co-workers was slightly affected. Tr. at 335. Petell's ability to respond appropriately to work pressures and changes in a routine work setting was markedly affected. Id.

Petell contends that Dr. Saleem's opinions are uncontradicted. To the extent that this argument references Dr. Saleem's diagnoses of IED, this is true. This is recognized by the ALJ who found the impairment to be severe in her analysis. Tr. at 18. There is no question that the psychiatric and neurological consultations and psychological review indicated Petell's complaints of IED. Tr. at 287. Rather, the ALJ disagreed with Dr. Saleem's ultimate opinion regarding Petell's ability to work. This is well within the ALJ's province. SSR 96-5P, 1996 WL 374183, at *1 (S.S.A. 1996) (explaining that determinations of disability are reserved for the Commissioner and to the extent a treating source comments on that issue, such commentary is "never entitled to controlling weight or special significance."); see also Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003) (explaining that a treating physician's opinion about disability "is not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1) & Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)).

To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134. The ALJ first stated that "[w]hile [Petell] claims a history of treatment for [IED], he was seen in January 2009 for the first time [by Dr. Saleem] since his prior treatment in 1997." Tr. at 25. The ALJ noted Petell had a GAF 65, which is mild. Id. The ALJ

found Dr. Saleem's opinion of extreme and marked limitations were unpersuasive because that opinion was not substantially supported by other evidence of record, and in a less persuasive manner, only supported by Dr. Saleem and Bowser's treatment notes.  Tr. at 25.  The ALJ further noted that despite Petell's allegation that he had always had difficulty getting along with others, he held jobs for fairly long periods of time, one of which for at least two years.  Tr. at 25, 43, 200.

During the psychiatric consultation dated April 18, 2009, CE and Psychiatrist Dr. Dennis M. Noia, Ph.D., noted that Petell was responsive and cooperative to questions and was calm, relaxed, and comfortable.  Tr. at 282–83.  Dr. Noia further noted that Petell's attention and concentration was intact.  Tr. at 282.  Petell's recent and remote memory skills were mildly impaired as he could recall three objects immediately and two after five minutes and restate four digits forward and three digits backward.  Tr. at 283.  Petell reported that he had no history of psychiatric hospitalizations and got along with friends and family.  Tr. at 281, 283.  Petell could regularly dress, bathe, groom himself, prepare food, do general cleaning, laundry, shopping, manage money, and take public transportation.  Tr. at 283.  Dr. Noia gave Petell a fair prognosis.  Tr. at 284.

During the neurological consultation dated April 18, 2009, CE and Neurologist Dr. Harbinder Toor, M.D. noted that Petell had no indication of impairment in recent or remote memory, insight, or judgment and Petell's mood and affect were appropriate. Tr. at 288.  Petell reported that he showers, bathes, dresses, cooks, cleans, and does laundry on a daily basis.  Id.

On May 12, 2009, medical consultant and reviewing psychologist Dr. H. Ferrin concluded that there was no evidence that Petell was limited in his ability to understand,

remember, and carry out detailed instructions.  Tr. at 312.  Petell's ability to work with

others without being distracted was not significantly limited.  Id.  Petell's ability to

respond appropriately to changes in the work setting was moderately limited.  Tr. at

313.

Drs. Noia, Toor, and Ferrin are specialists and medical consults.  The opinions of

medical consults like Drs. Noia, Toor, and Ferrin may constitute substantial evidence.

> It is well settled that an ALJ is entitled to rely upon the
> opinions of both examining and non-examining State agency
> medical consults, since such consultants are deemed to be
> qualified experts in the field of social security disability.
> Such reliance is particularly appropriate where . . . the
> opinions of these . . . State agency medical consultants are
> supported by the weight of the evidence.

See Fiozzo v. Barnhart, No. 05-CV-561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y.

Jan. 19, 2011) (citations omitted); see also Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d

Cir. 1995) (explaining that "the opinions of nonexamining sources [can] override treating

sources' opinions provided they are supported by evidence in the record.") (citations

omitted); McEaney v. Comm. of Soc. Sec., 536 F. Supp. 2d 252, 256 (N.D.N.Y. 2008)

("the evaluations of non-examining State agency medical and psychological consultants

may constitute substantial evidence . . . An ALJ must treat such evaluations as expert

opinion evidence of non-examining sources . . . This treatment extends to . . . RFC

assessments [because] . . . [s]tate agency consultants are experts in evaluating the

medical issues of disability claims.") (citations omitted).  The record does show that

Petell received medical and therapeutic treatment for IED from Dr. Saleem and Bowser.

Tr. at 167, 334.  But the record also shows that despite Petell's continued claim that he

had always had anger management problems, he never exhibited outbursts at any visit

with a medical personnel from as early as November 2007.  The ALJ "is entitled to rely not only on what the record says, but also on what it does not say."  <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1553 (2d Cir. 1983) (citations omitted).  The record fails to support such sweeping and broad restrictions as Dr. Saleem has proffered.  As such, given Dr. Saleem's opinions were inconsistent with other substantial record evidence, the ALJ did not err in declining to apply the treating physician's rule to the opinions of Dr. Saleem.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### b.  Failure to Develop the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. <u>See</u> <u>Perez v. Chater</u>, 77 F.3d 41, 47 (2d Cir. 1996) (citations omitted); <u>see</u> <u>also</u> 20 C.F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application . . . ."); 20 C.F.R. § 404.1512(e) (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations).  Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous."  <u>Webb v. Barnhart</u>, 433 F.3d 683, 687 (9th Cir. 2005) (citation omitted); <u>see</u> <u>also</u> <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ

already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted); Roat v. Barnhart, 717 F. Supp. 2d 241, 264 (N.D.N.Y. 2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

Petell argues that to the extent Dr. Saleem's opinion was unsupported or inconsistent with the record, the ALJ was required to recontact Dr. Saleem for further development of the medical opinion. An ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. Perez, 77 F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting . . . does not mean that an ALJ is required to re-contact a treating physician." Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. Id. at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before her. See Richardson v. Perales, 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").

In this case, despite the conflicting opinions, the ALJ properly determined that she could render a decision on the 245-page medical record. The ALJ found inconsistency among the opinions Dr. Saleem and other medical evidence of record. See Mongeur v.

Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he . . . have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) ("Notwithstanding the apparent inconsistency between [two medical] reports . . . we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

Accordingly, the Commissioner's decision on this issue should be affirmed.


### c. Weight Accorded to "Other Source"

Petell concedes that Bowser is not "an acceptable medical source" but argues that the ALJ had a duty to evaluate his opinion pursuant to SSR 06-03P. Saxon v. Astrue, 781 F .Supp. 2d 92, 103 (N.D.N.Y. 2011) (citation omitted). Social Security Ruling 06-03P provides, "[i]n addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. 2006). A social worker is defined as "other sources." Id. While information from an "other source" cannot be employed to establish a medically determinable impairment, it may provide insight into the severity of an impairment and how it affects a claimant's ability to work. Id. In weighing such opinions, the ALJ uses the same factors as those of "acceptable medical sources." Saxon, 781 F .Supp. 2d at 104 (citing inter alia 20 C.F.R. § 404.1527(d)). The ALJ may conclude that a licensed

social worker's opinion is not entitled to any weight but must provide an explanation for that decision.  Id.

The ALJ did not fail to consider Bowser's opinions.  Although the Social Security Regulation provides that the ALJ should explain the weight given to an "other source," the ALJ need only "ensure[] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  SSR 06-03P, 2006 WL 2329939, at *6.  Here, the ALJ referred to Bowser's opinions in the RFC assessment.  The ALJ first noted an April 2009 report of contact where Bowser indicated that Petell began counseling treatments with him in January 2009 for depressive order and anger management.  Tr. at 23, 167, 342–44.  Bowser reported that he was not qualified to evaluate the extent of Petell's issues with memory.  Tr. at 23, 167.  The ALJ proceeded to discuss the MSS that Bowser had co-signed.  Tr. at 24.  As discussed supra, the ALJ took issue solely with the severe and marked limitations given in the MSS because they are not supported by other evidence of record.  "Courts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical, formulaic applications of governing legal principles." Abdulsalam v. Comm'r of Soc. Sec., No. 12-CV-1631 (MAD), 2014 WL 420465, at *5 (N.D.N.Y. Feb. 4, 2014) (citation omitted).  As such, "despite the lack of specific weight assigned to the opinions, the Court is able to discern with ease the ALJ's reasoning, and [her] treatment of the evidence will not be disturbed."  Id. (citation omitted).

Accordingly, the Commissioner's decision on this issue should be affirmed.

### d. Substantial Evidence

Petell contends that the ALJ's RFC determination was not supported by substantial evidence. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." Pourpre v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient . . . Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

DiVetro v. Comm'r of Soc. Sec., No. 05-CV-830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Petell first contends that the ALJ erred by failing to ascribe work-related limitations

based on Petell's IED.  However, the ALJ did incorporate IED limitations into Petell's

RFC assessment.  Namely, the ALJ concluded that Petell is limited to medium work that

cannot have more than occasional contact with supervisors, co-workers, or the public.

This is supported by substantial evidence.  Dr. Saleem and Bowser opined that Petell

had only slight limitations in interacting appropriately with the public, supervisors, and

co-workers.  Tr. at 335.  Dr. Noia observed that Petell was responsive, cooperative, and

his manner of relating, social skills, and overall presentation was adequate, and he

appeared to be able to relate to and interact moderately well with others.  Tr. at 282,

284.  Further, Dr. Ferrin opined that Petell had no significant limitations in working in

coordination with or proximity to other people, interacting appropriately with the general

public, getting along with co-workers, and maintaining socially appropriate behavior.  Tr.

at 312–13.  Thus, this contention is without merit.

Petell next contends that the RFC does not incorporate limitations imposed by

Petell's GERD and migraine headaches.  This is inaccurate.  The RFC assessment

discussed Petell's GERD.  Tr. at 24.  The ALJ noted that Petell was diagnosed with

GERD, esophageal stricture, and gastritis.  Tr. at 24, 367, 380–81.  The ALJ noted that

Edwards had treated Petell's GERD and limited him to no heavy lifting or weightlifting.

Tr. at 25, 253.  There is no other record evidence indicating limitations imposed by the

GERD.  The ALJ's RFC assessment also discussed Petell's migraine headaches,

noting Petell's claim that he was having migraines more frequently.  Tr. at 22.  The ALJ

stated that Petell received treatment for migraines, which became stable with

medication.  Tr. at 23.  Petell saw Dr. Mazdzer in October 2008, who opined that

Petell's neurological and cerebellar examinations were normal; thus, he could safely

drive and return to work without restrictions.  Tr. at 23, 245.  A neurological consultative examination in April 2009 showed that Petell was having daily headaches.  Tr. at 24, 323.  In August 2009 and April 2010, Petell reported to Edwards that his headaches were controlled.  Tr. at 24, 255, 375.  As previously discussed, the relevant medical records largely indicate that Petell's headaches are controlled with medication.  Ultimately, the ALJ found that "the medical records [relevant to migraine headaches] do not corroborate the frequency or intensity" as alleged.  Tr. at 25.  Accordingly, the ALJ did incorporate GERD and migraine headaches conditions into the RFC where appropriate and, where she disagreed, namely with respect to the frequency and intensity of the migraine headaches, she identified and outlined why.

The ALJ found that Petell could perform medium work with occasional contact with supervisors, co-workers, and the public.  Medium work consists of lifting no more than fifty pounds at a time with frequent lifting or carrying objects weighing up to twenty-five pounds.  20. C.F.R § 416.967(b).  The record does not show that Petell has any exertional limitations.  There is no record evidence indicating that Petell was ever in acute distress at any doctor's appointment.  In July 2009, Petell reported to Edwards that he was lifting weights with Bowflex, specifically doing curls and bench presses.  Tr. at 253.  In October 2008, Dr. Mazdzer reported that Petell's motor exam and gait were normal and that Petell could safely operate a motor vehicle.  Tr. at 257.  In April 2009, Dr. Toor observed that Petell's gait and station were normal and a tandem walk from heel to toe was normal.  Tr. at 288.  Petell required no assistance to change for the exam, could rise from a chair without difficulty, had intact hand and finger dexterity, and had a grip strength of 5/5 bilaterally.  Id.  Further, Petell's range of motion throughout

the body was normal.  Id.  Given the above relevant evidence, a reasonable mind might

accept is adequate to support the ALJ's RFC assessment.  Halloran, 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.


### 3.  Petell's Credibility

The ALJ determines whether an ailment is an impairment based on a two-part test.

First, the ALJ must decide, based upon objective medical evidence, whether "there [are]

medical signs and laboratory findings which show . . . medical impairment(s) which

could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc.

Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This

primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529

(2003).  "'Second, if the medical evidence alone establishes the existence of such

impairments, then the ALJ need only evaluate the intensity, persistence, and limiting

effects of a claimant's symptoms to determine the extent to which it limits the claimant's

capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc.

Sec. Admin., No. 01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept.

11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these

symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529

(2003).  "Pain itself may be so great as to merit a conclusion of disability where a

medically ascertained impairment is found, even if the pain is not corroborated by

objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983)

(citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability

requires more than mere inability to work without pain." <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1552 (2d Cir. 1983). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. <u>Dumas v. Schweiker</u>, 712 F.2d 1545, 1552 (2d Cir. 1983). In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." <u>Snell v. Apfel</u>, 177 F.3d 128, 135 (2d Cir. 1999) (citing <u>Donato v. Sec'y of HHS</u>, 721 F.2d 414, 418-19 (2d Cir. 1983)). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. <u>Aponte v. Sec'y of HHS</u>, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. <u>See</u> <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i) [The claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his]

back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

Petell contends that the ALJ's credibility determination is unsupported by substantial evidence. In this case, the ALJ found that while Petell had severe impairments, Petell's allegations of disability were not credible. Tr. at 24–25.

Petell contends that Dr. Toor indicated his migraines could interfere with his daily routine. However, as the ALJ noted and the records reflect, Petell is able to substantially perform activities of daily living. Tr. at 20, 25. The ALJ repeatedly noted that Petell's medical notes show his migraine headaches are well controlled by medication. Tr. at 18–19, 25. Dumas v. Schweiker, 712 F.2d 1545, 1552–53 (2d Cir. 1983) ("Although [plaintiff] now complains of severe debilitating headaches, headaches did not factor significantly into any of the medical opinions concluding that [plaintiff] was unable to return to his prior employment . . . . Moreover, there is evidence . . . that Bufferin helped to relieve the pain.").

Petell also contends that Dr. Saleem's opinion with respect to extreme and marked limitations constitutes substantial evidence of IED's limitations on Petell's work abilities. However, substantial evidence consisting of the opinions of Drs. Noia, Toor, and Ferrin, as previously discussed, support the ALJ's determination that Petell's IED is not as disabling as Petell alleged. Further, the ALJ noted that Petell was seen for the first time in January 2009 for IED since 1997. Tr. at 25. Furthermore, the ALJ found that, despite Petell's assertion that he did not get along with other people and did not like

taking orders, Petell was able to work for extended periods of time.  Tr. at 25, 43.  Petell also testified that he got along with his family.  Tr. at 25, 50.  Moreover, the ALJ recognized that not once did Petell had an outburst at a doctor's exam or appointment.  Tr. at 25.  Rather, the records show that Petell was always cooperative and responsive.  Additionally, Petell testified that his temper tantrums consists of swearing at times and throwing a hammer but was never violent.  Tr. at 52.  As discussed <u>supra</u>, Dr. Saleem's opinions of severe and marked limitations were not substantially supported by other evidence of record.

As for Petell's credibility with respect to GERD, the ALJ noted that Petell experienced faintness and vomiting after exercising and lifting heavy weights.  Tr. at 25, 253.  The ALJ did not dismiss this impairment; rather, there is an absence of medical records indicating that the affects of Petell's GERD was disabling or severe.  Given the above relevant evidence, a reasonable mind might accept that the ALJ's credibility finding is adequately supported.  <u>Halloran</u>, 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.


### 4.  Psychological Review Technique ("PRT")

As previously stated, in order to be considered disabled, a claimant must suffer from either a medically determinable physical or mental impairment.  42 U.S.C. § 1382(a)(3)(A).  When evaluating a mental impairment, there is a "special technique" outlined in 20 C.F.R. § 404.1520a which requires consideration of four areas of potential limitation:  "[a]ctivities of daily living; social functioning; concentration,

persistence, or pace; and episodes of decompensation." Id. § 1520a(c)(3). Where evidence of a colorable mental impairment has been proffered, failure to engage in the "special technique" generally requires remand. Kohler v. Astrue, 546 F.3d 260, 266–69 (2d Cir. 2008); see also Moore v. Barnhart, 405 F.3d 1208, 1214 (11th Cir. 2005) ("holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete . . . [the special technique]. Failure to do so requires remand.") (citations omitted).

In the written decision, an ALJ:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4). "Current regulations do not require completion of the Psychiatric Review Technique Form . . . by the ALJ, but do require that his or her decision document application of the special technique." Echandy-Caraballo v. Astrue, No. CA 06-97M, 2008 WL 910059, at *3 (D.R.I. Mar. 31, 2008) (citing 20 C.F.R. § 404.1520a(e)(2)).

As an initial matter, Petell first contends that the ALJ should have considered that Petell suffers from IED. In this case, the ALJ concluded that Petell's IED constituted a severe medically determinable impairment though it did not meet or equal one of the impairments listed in the regulations. Thus, the record belies this contention.

Petell argues that the ALJ failed to properly apply PRT for evaluating Petell's IED by

assigning him only modest limitations based on a limited review of the evidence. Here, the ALJ included in her decision specific findings as to the degree of limitation in each of the four functional areas. The ALJ stated that Petell had mild restriction in activities of daily living ("ADL") for Petell had no problems with ADL and enjoyed fishing. Tr. at 20. The ALJ cited to Petell's ADL report, which indicates that Petell fed and walked two dogs, had no difficulties with handling personal hygiene, performed light lawn work, and occasionally handled laundry and household chores. Tr. at 153–54. Furthermore, the ALJ accurately noted in her RFC assessment that Petell testified he "goes into his shed and putters" and "helps around the house." Tr. at 22, 50–51. The ALJ next stated that Petell had moderate difficulties in social functioning. Tr. at 20. The ALJ noted that while Petell alleged he had more explosive episodes, the record showed that he was cooperative at all his examinations. See, e.g., Tr. at 238–55. Petell was calm, relaxed, and comfortable at the CE examination. Tr. at 314–15. The ALJ took this into consideration in Petell's RFC, concluding that Petell should be limited to occasional contact with supervisors, co-workers, or the public. Tr. at 20. The ALJ next stated that Petell had mild difficulties in concentration, persistence, or pace. Tr. at 21. The ALJ noted that Petell did not shop but could handle money. Tr. at 21, 283. The ALJ noted while Petell alleged difficulties with memory, attention, and concentration, an April 2009 neurologic examination was unremarkable without indication of recent or remote memory impairment. Tr. at 21, 288. Further, the CE psychiatric examination showed that Petell's attention and concentration were intact. Tr. at 21, 74. Thus, Petell's allegations were not supported by the mental status examination findings. Tr. at 21. Finally, the ALJ noted Petell had no episodes of decompensation. Id.

Given the ALJ's specific ratings and findings on each of the four functional areas, which are bolstered by evaluations from medical personnel who evaluated Petell, it cannot be said that the ALJ failed to carry out PRT analysis.  Cf. Kohler, 546 F.3d at 267 (finding the ALJ failed to include specific findings with respect to each functional area).

Petell next contends that the ALJ's rating of Petell's functional limitations was inconsistent because the ALJ first stated that Petell's mental health imposed mild and moderate restrictions but later concluded that Petell's mental health would impose little or no effect on his ability to work.  Tr. at 26.  However, as the ALJ expressly explained, the first limitations identified were "used to rate the severity of mental impairments at steps 2 and 3" and were not a RFC assessment for steps four and five.  Tr. at 21.  The RFC assessment requires consideration of "the combined effect of . . . impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523.  Furthermore, "the functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work."  20 C.F.R. Part 404, Subpart P, App'x 2, § 2003.00(b).  Accordingly, the ALJ's findings were not inconsistent.

Petell further contends that (1) the ALJ failed to credit Dr. Saleem's conclusions extreme and marked limitations, which are supported by Bowser and (2) the resulting informed listings analysis was flawed because of the alleged failure to apply the PRT. As discussed supra, because the ALJ's RFC assessment is supported by substantial

evidence and the ALJ did not fail to properly apply the PRT, these arguments are rendered moot.

Finally, Petell contends that RFC assessment does not incorporate the moderate limitations as she determined the IED to have on Petell's ability to work. However, the ALJ incorporated such limitations when she limited Petell's medium work base to occasional contact with supervisors, co-workers, and the public. As such, Petell's contentions with respect to the PRT analysis are without merit.

Accordingly, remand is not necessary and the Commissioner's decision on this issue should be affirmed.


## 5. Use of the Grids

The ALJ then conducted her Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). See Heckler v. Campbell, 461 U.S. 458, 462 (1983); Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." Pratts v. Chater, 94 F.3d 34, 38–39 (2d Cir. 1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. Bapp v. Bowen, 802 F.2d 601, 605–06 (2d Cir. 1986) (citations omitted). In this case, Petell contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effects of his migraine headaches and GERD.

"[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. Bapp v. Bowen, 802 F.2d 601, 603, 605 (2d Cir. 1986). As explained supra, no further testimony was required. Petell's migraine headaches were documented to have been well controlled, despite his testimony indicating otherwise. Furthermore, the record is devoid of any incident where Petell had an outburst from IED or any episode that affected his ability to work. As noted, the ALJ is entitled to rely on what the record does not say. Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) (citations omitted). These limitations do not constitute a significant diminishment of Petell's capacities so that his non-exertional impairments precluded the ALJ from using the Grids.

Accordingly, while the non-exertional limitations were considerations which the ALJ included in the RFC, further testimony was not required because the impairments did not significantly diminish Petell's abilities to the point where a vocational expert was required.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the

foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: February 28, 2014
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge